UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIBERTY SURPLUS INSURANCE CORPORATION, | Case No. 20-cv-03669-EMC |
| Plaintiff, | |
| v. | **ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| SETH SAMUELS, et al., | Docket No. 49 |
| Defendants. | |

Plaintiff Liberty Surplus Insurance Corporation initiated this insurance coverage action against two groups of defendants: (1) the Hamrick Defendants[1] ( "Hamrick") and (2) the Samuels Defendants[2] ("Samuels"). Liberty's insured is Hamrick. Hamrick consists of a law firm and lawyers who work there. Hamrick was sued for malpractice by its clients, the Samuels. At the trial level, the Samuels prevailed, obtaining a judgment of approximately $4.8 million against Hamrick, but the case is currently on appeal. Liberty filed the instant case, primarily seeking a declaration that (1) under the insurance policy purchased by Hamrick, Liberty has a limit on liability of $2 million and (2) once that $2 million has been exhausted, Liberty has no further obligation to defend or indemnify Hamrick. Apparently, Hamrick assigned any interests it had against Liberty to the Samuels, *see* Stip., Ex. D (Stip. ¶ B.2), and thus the Samuels stand in Hamrick's shoes in the instant case. In June 2020, Liberty voluntarily dismissed Hamrick from

---

[1] The Hamrick Defendants are: Hamrick & Evans, LLP; Raymond Hamrick III; and Kenneth Greene.

[2] The Samuels Defendants are: three brothers (Seth Samuels, Stephen Samuels, and Stacy Samuels) and affiliated entities (Chateau de Louis LLC; No. Nine, LLC; and Real Enterprises, LLC).

the lawsuit.  *See* Docket No. 18 (notice).

Currently pending before the Court is Liberty's motion for summary judgment.  The main issue before the Court is whether Liberty's limit on liability is $2 million (for "Each Claim") or $4 million (in the "Aggregate"), which turns on whether the malpractice claims against Hamrick compose one or two "claims" under the Liberty insurance policy.  Liberty claims the former; the Samuels the latter.  Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court finds Liberty's position more persuasive and thus **GRANTS** its motion for summary judgment.

## I.    FACTUAL & PROCEDURAL BACKGROUND

The parties stipulated to certain facts and exhibits in conjunction with the motion for summary judgment.  The relevant stipulations are as follows.

A.    Liberty Policy

Hamrick had an insurance policy with Liberty.  *See* Stip. No. 1.  A copy of the policy can be found at Exhibit G (attached to the stipulations).

As reflected in Exhibit G, the declarations page states the following limits of liability: $2 million for "Each **Claim**" and $4 million in the "Aggregate."  Declarations at 2 (bold in original).  The following comes from the declarations page.

# Lawyers Professional Liability Policy

| ITEM 4. | LIMITS OF LIABILITY: | |
|---|---|---|
| | Each **Claim**: | $ 2,000,000 |
| | Aggregate: | $ 4,000,000 |

| ITEM 5. | DEDUCTIBLE: | |
|---|---|---|
| | Each **Claim**: | $   25,000 |
| | Aggregate: | N/A |

| ITEM 6. | PREMIUM: | $ REDACTED |
|---|---|---|

United States District Court
Northern District of California

As for the policy itself, § 1 covers the insuring agreement.  The policy states in relevant part that the Insured shall be paid "all sums in excess of the Deductible amount and up to the Limits of Liability Stated in the Declarations which the **Insured** shall become legally obligated to pay as **Damages** and **Claims Expenses** as a result of **CLAIMS** FIRST MADE AGAINST THE **INSURED** . . . as a result of a **Wrongful Act** for which the Insured is legally responsible . . . ." Policy at 1 (bold in original).

A "Claim" is defined as "a demand received by the **Insured** for money or services, including the service of suit or institution of arbitration proceedings against the **Insured** arising out of a **Wrongful Act**."  Policy at 2 (bold in original).

"Damages" is defined as "a monetary judgment or settlement."  Policy at 2 (also stating what damages do *not* include).

"Claim expenses" is defined, *inter alia*, as "reasonable and necessary fees, costs and expenses charged by any lawyer or any other person or entity retained, selected, or approved by the Company to investigate, defend, and/or settle a **Claim**."[3]  Policy at 2 (bold in original).

Section 6 of the insurance policy addresses Limits of Liability.

- Section 6(a) addresses the Limits for "Each Claim": "The liability of the Company for EACH **CLAIM** . . . shall not exceed the amount stated in the Declarations for Each **Claim**, and shall include all **Claim Expenses**."  Policy at 8 (bold in original).

- Section 6(b) addresses the Limits for the "Aggregate": "The total liability of the company for ALL **CLAIMS** . . . shall not exceed the amount stated in the Declarations as Aggregate, and shall include all **Claim Expenses**."  Policy at 8 (bold in original).

Section 6(d) explains that, in certain instances, even if there are multiple claims, those claims are still treated as a single "Claim."  The policy states: "**Claims** alleging, based upon, arising out of or attributable *to the same or related acts*, errors or omissions shall be treated as a single **Claim** . . . ."  Policy at 9 (bold in original; italics added).

---

[3] "As of April 8, 2021, [Liberty] has paid Claim Expenses, excess of the [$25,000] deductible, of $1,197,866."  Stip. No. 41.  This represents the costs of defending the malpractice action.

3

United States District Court
Northern District of California

1
2
3

After Hamrick was sued for malpractice, it tendered the action to Liberty pursuant to the policy.  Liberty agreed to defend under a reservation of rights.  *See* Stip. No. 5.  The events underlying the malpractice suit are described below.

4   B.   Noriega Project

5
6
7
8
9

The Samuels were previously a client of Hamrick.  In 2002, several years before the Samuels hired Hamrick to provide legal services, the Samuels hired a "general contractor, Pine Wave Construction, Inc. ('PW1'), for the construction of three adjoining, four-story buildings for mixed use residential (condominiums) and commercial real estate (retail stores and parking) on Noriega Street in San Francisco, California ('Noriega Project')."  Stip. No. 6.

10
11
12
13
14
15

In December 2003, when the construction project was almost finished, "the Samuels discovered there were construction defects in every building system," including but not limited to windows as well as framing, siding, plumbing, electrical, and so forth.  *See* Stip. No. 7.  Defects related to the windows involved "poor window installation [which] left the buildings vulnerable to water intrusion."  Stip No. 8.  After PW1 was not able to repair the defects, the Samuels stopped paying, and PW1 abandoned the construction project.  *See* Stip. No. 9.

16
17

In January 2004, PW1 set up a new company, PW Commercial Construction ("PW2") and began transferring assets and projects from PW1 to PW2.  *See* Stip. No. 10.

18   C.   Arbitration with PW1

19
20
21
22
23

In May 2004, PW1 filed an arbitration demand against the Samuels.  The Samuels responded with a cross-claim, "seeking recovery of the costs to address damage to the interior of the structures caused by water intrusion due to the defective installation of windows, flashing, and related components."  Stip. No. 11.  The Samuels were awarded approximately $1.8 million in the arbitration.  *See* Stip. No. 12.

24
25

Subsequently, "PW1 surrendered its contractor's license, completed shutdown of its operations, and divested its assets."  Stip. No. 13.

26   D.   Representation by Hamrick

27
28

In December 2006, the Samuels initiated a collection action in state court against PW2 as well as the individual owners and shareholders of PW1.  The collection action shall hereinafter be

4

1    referred to as the "Collection/Au Action."  *See* Stip. No. 15.  The Samuels initially hired the Rutan

2    & Tucker law firm to represent them in the Collection/Au Action.  *See* Stip. No. 14.

3              In February 2007, PW2 filed for bankruptcy.  The bankruptcy proceeding shall hereinafter

4    be referred as the "Bankruptcy Action."  Because of bankruptcy stay, the Collection/Au Action

5    could not proceed as to PW2.  *See* Stip. No. 17.

6              In October 2007, the Samuels had Kenneth Greene substitute in as counsel "to continue

7    prosecution of the [Collection/]Au Action, participate in the PW2 bankruptcy proceeding, and take

8    any such other actions agreed upon with Samuels."  Stip. No. 19.  Shortly thereafter, Mr. Greene

9    joined Hamrick and brought with him the work he was doing for the Samuels.  *See* Stip. No. 20.

10             In June 2008, as part of their effort to obtain compensation for the defective construction,

11   the Samuels filed a declaratory relief action in state court against PW1's commercial general

12   liability insurer, Everest Indemnity Insurance Company ("Everest").  This lawsuit shall hereinafter

13   be referred to as the "Everest Action."  Hamrick represented the Samuels in this action as well.

14   *See* Stip. No. 21.

15             In August 2008, in furtherance of their effort to obtain compensation, the Samuels filed a

16   breach of warranty suit against the manufacturers of the defective windows which PW1 installed

17   in the Noriega Project.  This action shall hereinafter be referred to as the "Windows Action."  As

18   above, Hamrick represented the Samuels in the case.  *See* Stip. No. 22.

19             Accordingly, Hamrick represented the Samuels in four different proceedings: the

20   Collection/Au Action, the Bankruptcy Action, the Everest Action, and the Windows Action.  All

21   actions were related to the Noriega Project, specifically, to address injuries the Samuels had

22   suffered as a result of construction defects in the Noriega Project.

23             "In December 2008, the owners/shareholders of PW1 successfully moved for summary

24   adjudication of the Samuels' alter ego claims" in the Collection/Au Action.  Stip No. 23.  The

25   Samuels subsequently dismissed the Collection/Au Action without prejudice in August 2009.  *See*

26   Stip. No. 24.  The Samuels were thus unable to collect against the individual principals of PW1.

27             In September 2010, the state court in the Everest Action ruled in favor of Everest, thus

28   barring recovery against PW1's insurer.  *See* Stip. No. 25.

United States District Court
Northern District of California

5

1    In 2013, the Samuels recovered approximately $223,000 in the Bankruptcy Action.  *See*

2    Stip. No. 26.

3    Subsequently, "Hamrick was relieved as counsel for the Samuels in the Windows Action."

4    Stip. No. 27.  The Samuels' new counsel ultimately settled the Windows Action for $130,000.  *See*

5    Stip. No. 28.

6    E.    Malpractice Action

7    In October 2013, the Samuels filed a malpractice suit against Hamrick.  This suit shall

8    hereinafter be referred to as the "Malpractice Action."  *See* Stip. No. 3.  A copy of the operative

9    second amended complaint filed in the Malpractice Action can be found at Exhibit A (attached to

10   the stipulations).  In the suit, the Samuels alleged, *inter alia*, that Hamrick "made multiple legal

11   and procedural errors in the handling of the [Collection/Au Action]"; that Hamrick made

12   "[a]dditional errors [which] resulted in the loss of the [Everest Action]"; that, "to remediate the

13   consequences of their mishandling of the case(s), [Hamrick] offered to handle [Plaintiffs'] claim

14   against IWC, the company which supplied the windows installed" for the construction project "on

15   a contingency fee basis" but "later reneged"; and that Hamrick abandoned the Samuels in the

16   Windows Action on the eve of trial.  Ex. A (SAC ¶¶ 1, 28, 31, 39, 42).

17   As noted above, Hamrick tendered the Malpractice Action to Liberty, and Liberty agreed

18   to defend under a reservation of rights.  *See* Stip. No. 5.

19   In the Malpractice Action, Hamrick filed a cross-complaint against the Samuels for breach

20   of contract and unjust enrichment, seeking approximately $1.54 million plus prejudgment interest

21   based on legal services rendered.  *See* Stip. No. 4.

22   In October 2016, the Samuels and Hamrick resolved the cross-complaint (without

23   Liberty's consent).  Hamrick dismissed the cross-complaint in exchange for (1) "the Samuels'

24   covenant not to execute against Hamrick for any judgment rendered in the Malpractice Action"

25   and (2) Hamrick's assignment of future rights against Liberty to the Samuels.  Stip. No. 31.

26   The Malpractice Action was tried between October and November 2008.  The only cause

27   of action at issue was one for professional negligence.  *See* Stip. No. 33.  The Samuels dropped

28   that part of the claim related to Hamrick's conduct in the Everest Action.  *See* Stip. No. 34.

United States District Court
Northern District of California

6

1    In May 2019, the state court held that "Hamrick's malpractice was the cause of the

2    Samuels' failure to collect the Arbitration Award but that the Samuels failed to prove attorney

3    malpractice with respect to the Windows Action."  Stip. No. 35.  The Samuels obtained a

4    judgment worth approximately $4.82 million.  *See* Stip. No. 36.  That judgment is currently on

5    appeal.  *See* Stip. No. 37.

6                                    **II.        DISCUSSION**

7    A.    Legal Standard

8          Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment

9    [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and

10   the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is

11   genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.

12   *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a

13   scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could

14   reasonably find for the [nonmoving party]."  *Id.* at 252.  At the summary judgment stage, evidence

15   must be viewed in the light most favorable to the nonmoving party and all justifiable inferences

16   are to be drawn in the nonmovant's favor.  *See id.* at 255.

17         In the instant case, a critical issue for the Court is one of contract interpretation – *i.e.*,

18   interpretation of the insurance policy.  "[I]nterpretation of an insurance policy is a question of

19   law."  *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995).  "Contract interpretation, as a

20   question of law, is often amenable to summary judgment, although '[s]ummary judgment may be

21   inappropriate in a contract case if there is a dispute over a material fact necessary to interpret the

22   contract.'"  *Essex Walnut Owner L.P. v. Aspen Specialty Ins. Co.*, 335 F. Supp. 3d 1146, 1150

23   (N.D. Cal. 2018) (Chen, J.).

24   B.    Contract Interpretation

25         As noted above, a "Claim" is defined in the insurance policy as "a demand received by the

26   **Insured** for money or services, including the service of suit or institution of arbitration

27   proceedings against the **Insured** arising out of a **Wrongful Act**."  Policy at 2 (bold in original).

28   Section 6(d) of the policy provides that, in certain instances, multiple claims are treated as a single

United States District Court
Northern District of California

1    "Claim."  The policy states: "**Claims** alleging, based upon, arising out of or attributable to *the*

2    *same or related acts*, errors or omissions shall be treated as a single **Claim** . . . ."  Policy at 9 (bold

3    in original; emphasis added)).  In the pending motion, Liberty contends that the claims made

4    against Hamrick for malpractice in the Collection/Au Action and in the Windows Action arise out

5    of or attributable to the same or related acts and thus should be treated as a single claim.  In

6    response, the Samuels argues that the claim for malpractice related to the Collection/Au Action is

7    separate and different from the claim for malpractice related to the Windows Action.[4]  Both parties

8    agree that the issue here is one contract interpretation – specifically, interpretation of § 6(d).

9          Under California law,

10          [t]he fundamental rules of contract interpretation are based on the
           premise that the interpretation of a contract must give effect to the
11          "mutual intention" of the parties."  Under statutory rules of contract
           interpretation, the mutual intention of the parties at the time the
12          contract is formed governs interpretation.  Such intent is to be
           inferred, if possible, solely from the written provisions of the
13          contract.  The 'clear and explicit' meaning of these provisions,
           interpreted in their 'ordinary and popular sense,' unless 'used by the
14          parties in a technical sense or a special meaning is given to them by
           usage' controls judicial interpretation."  A policy provision will be
15          considered ambiguous when it is capable of two or more
           constructions, both of which are reasonable.  But language in a
16          contract must be interpreted as a whole, and in the circumstances of
           the case, and cannot be found to be ambiguous in the abstract.
17          Courts will not strain to create an ambiguity where none exists.

18   *Waller*, 11 Cal. 4th at 18-19.

19          If there is ambiguity, however, it is resolved by interpreting the
           ambiguous provisions in the sense the promisor (i.e., the insurer)
20          believed the promisee understood them at the time of formation.  If
           application of this rule does not eliminate the ambiguity, ambiguous
21          language is construed against the party who caused the uncertainty
           to exist.
22

23   *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 822 (1990).

24

25   _____

     [4] At the hearing, the Samuels focused not so much on the issue of Aggregate liability under the
26   policy but argued instead that fees incurred by Liberty in defending the malpractice claim based
     on the Windows Action should not count toward the $2 million limit on liability which would
27   apply to the malpractice claim based on the Collection/Au Action.  While the focus is different,
     the Samuels' argument raises the same question whether the malpractice claims based on the
28   Collection/Au Action and Windows Action constitute two separate "Claims" under the Liberty
     policy.

United States District Court
Northern District of California

United States District Court
Northern District of California

1        Although *Waller* and *AIU* provide the general approach for contract interpretation in the

2 insurance context, both parties agree (correctly) that there is a California Supreme Court case

3 more directly on point with respect to the issue at hand – namely, *Bay Cities Paving & Grading,*

4 *Inc.*, 5 Cal. 4th 854 (1993). *Bay Cities*, like the instant case, involved a provision in an insurance

5 policy addressing when multiple claims may be treated as a single claim. Because *Bay Cities* is a

6 critical case, the Court discusses the case in some detail below.

7 C.     <u>*Bay Cities*</u>

8        The plaintiff in *Bay Cities* was a general contractor. It had completed work on a certain

9 project but was unable to collect a significant portion of the money it was owed. It therefore hired

10 an attorney. The attorney filed a mechanic's lien on the contractor's behalf; however, he failed to

11 serve a stop notice on the project's construction lenders, and he further failed to timely seek

12 foreclosure on the mechanic's lien. *See id.* at 858. The contractor thus sued the attorney for legal

13 malpractice, "alleging that he had been negligent [1] in [failing to serve a stop notice and [2] in

14 failing to foreclose the mechanic's lien." *Id.* The lawyer tendered the defense of the malpractice

15 suit to this insurance company. *See id.*

16        The insurance policy between the lawyer and the insurance company provided that there

17 was a limit of liability of $250,000 for each claim made against the insured. The annual aggregate

18 was $750,000. The insurance policy also included the following provision: "'Two or more claims

19 arising out of a single act, error or omission or a series of related acts, errors or omissions shall be

20 treated as a single claim.'" *Id.* at 859 (emphasis omitted). The contractor argued[5] that there were

21 "two separate claims [made against the attorney], each of which is subject to the per-claim limit of

22 $250,000, because each of [the lawyer's] two omissions resulted in a separate injury to [the

23 contractor]." *Id.* The insurance company disagreed, asserting that there was only a single claim.

24 *See id.*

25        The California Supreme Court ruled in favor of the insurance company. It held first that

26 the contractor had suffered only a single injury, even though the attorney had allegedly been

27

28 [5] The contractor made this argument, and not the attorney, because the parties had made an arrangement under which the attorney was dismissed from the suit.

9

negligent in two different ways: "Bay Cities [the contractor] had one primary right – the right to be free of negligence by its attorney in connection with the particular debt collection for which he was retained.  He allegedly breached that right in two ways, but it nevertheless remained a single right."  *Id.* at 860.  The court acknowledged the contractor's contention that "it had two *sources* of payment of its construction work: (1) foreclosure of the mechanic's lien, and (2) serving a timely stop notice on the project's construction lenders."  *Id.* (emphasis added).  But

> [t]hese two procedures . . . arose from the same transaction – Bay Cities' work on the project – and were merely different remedies for nonpayment out of the amount owed to Bay Cities.  Thus, Bay Cities had a single right – the right to payment for its construction. The loss of that right as a result of the attorney's two omissions resulted in a single injury.

*Id.* at 860-61.  The court emphasized: "when, as in this case, a *single* client seeks to recover from a *single* attorney alleged damages based on a *single* debt collection matter for which the attorney is retained – there is a *single* claim under the attorney's professional liability insurance policy."  *Id.* at 861 (emphasis in original).

Importantly, the California Supreme Court went on to hold that, even if it "view[ed] each of the attorney's two omissions as giving rise to a separate claim by Bay Cities," *id.* at 866, the contractor would be no better off because the two omissions were still *related* acts and therefore, under the policy, would be deemed a single claim.  The Court pointed to the provision in the policy stating that "'[t]wo or more claims arising out of a single act, error or omission or *a series of related acts, errors or omissions* shall be treated as a single claim.'"  *Id.* (emphasis in original). The Court rejected the lower appellate court's conclusion that the term "related" (as used in the relevant provision) was ambiguous and should be construed "to mean only errors that are causally related to one another."  *Id.*  It stated that "'[r]elated' is a commonly used word with a broad meaning that encompasses a myriad of relationships" – not just causal relationships but also logical relationships.  *Id.* at 868.  That being said, "[t]he proper question is whether the word is ambiguous in the context of *this* policy and the circumstances of *this* case," not whether the word is "ambiguous in the abstract or in some hypothetical circumstance."  *Id.* (emphasis in original).

We find no ambiguity because the construction of "related"

advocated by Bay Cities is not reasonable. If an attorney's error causes one or more other errors, the result is a chain of causation that leads to an injury, that is, a single claim. One of the decisions on which Bay Cities relies makes this very point. "[E]ven though there have been multiple causative acts, there will be a single 'occurrence' if the acts are causally related to each other as well as to the final result." A single claim is, of course, subject to the per-claim limitation of the policy. Similarly, if the chain of causally related events somehow led to two claims (a result difficult to imagine), they would be treated as a single claim under Bay Cities' view of "related," and would be subject to the per-claim limitation. Thus, if the related-acts limitation were applied only to causally related acts, the related-acts limitation would be duplicative of the per-claim limitation.

Moreover, the "causally related" test ignores the nature of the injury. For example, assume an attorney makes two separate omissions during a trial. The attorney fails to object to the admission of an otherwise inadmissible document submitted by the opponent and also fails to produce a key witness on behalf of the client. Each error independently leads to an adverse judgment against the client. Under Bay Cities' analysis, there are two claims because neither error caused the other error. If, however, the two claims were causally related, there would be only one claim under the policy. We are not persuaded. Regardless of whether the two errors are independent or causally related, the injury to the client is the same – the adverse judgment. Moreover, when two or more errors lead to the same injury, they are – for that very reason – "related" under any fair and reasonable meaning of the word.

*Id.* at 868-69.

Ultimately, the California Supreme Court held that

the term "related" as it is commonly understood and used encompasses both logical *and* causal connections. Restricting the word to only causal connections improperly limits the word to less than its general meaning. *"Related" is a broad word*, but it is not therefore a necessarily ambiguous word. We hold that, as used in this policy and in these circumstances, "related" is not ambiguous and is not limited only to causally related acts.

We do not suggest, however, that, in determining the amount of coverage, the term "related" would encompass every conceivable logical relationship. At some point, a relationship between two claims, though perhaps "logical," might be so attenuated or unusual that *an objectively reasonable insured could not have expected they would be treated as a single claim under the policy*.

*Id.* at 873 (emphasis added).

Notably, in reaching its holding above, the California Supreme Court cited a Seventh Circuit decision, *Gregory v. Home Insurance Company*, 876 F.2d 602 (7th Cir. 1989), as a

United States District Court
Northern District of California

persuasive case.  In *Gregory*, the insured was a lawyer.  His client (PBC) was a brokerage company.  PBC was a broker for a certain videotape series called "Fabulous Follies."

> The videotapes were sold individually to investors, most of whom, at the time of sale, also signed a promissory note and a production service agreement authorizing PBC to market the purchased videotape on behalf of the buyer.  The success of PBC's videotape investment program depended upon these production service agreements, since PBC hoped to market the videotapes collectively as a series to cable and television stations.  The videotape sale, promissory note and production service agreement were intended to form an investment "package."

*Id.* at 602-03.

PBC hired a law firm to provide certain legal services related to the videotape investment program.  The law firm drafted for PBC: (1) the production service agreement, (2) the promissory note, and (3) a tax and security opinion letter, "advis[ing] that the videotapes were not securities (and thus didn't need to be registered with the Securities Exchange Commission), and that buying the videotapes would give the buyers certain tax advantages.  The opinion letter was reprinted in a sales brochure PBC distributed to prospective buyers." *Id.* at 603.  Ultimately, the IRS disagreed with the law firm's tax opinion.  The buyers of the videotapes thus sued PBC and the law firm; PBC cross-claimed against the law firm.  *See id.* at 603-04.

The law firm had an insurance policy with a provision similar to that in *Bay Cities* and that in the instant case – *i.e.*, regarding when multiple claims would be deemed a single claim.  The Seventh Circuit agreed with the district court that the buyers' claims against the law firm all constituted a single claim under the policy: "the individual buyers' claims all arose from the same conduct of Mr. Gilbert [the lawyer]." *Id.* at 605.  In addition, the Seventh Circuit agreed with the district court that the buyers' claim and PBC's claim together should be deemed a single claim. *See id.* at 606.  The Seventh Circuit endorsed the lower court's reasoning that the law firm's acts of drafting of (1) the tax and security opinion letter, (2) the promissory note, and (3) the production service agreement were all related for purposes of the insurance policy:

> "The opinion letter repeatedly refers to the other two documents, and *it is clear the three are interdependent components of a single plan*.  Moreover, the Court finds that Gilbert's advising PBC of the tax and security law consequences of its offering, specifically his alleged failure to tell PBC that its offering was a security and should

12

> be registered, was also a related act, by any plain and ordinary
> meaning of "related." Gilbert's opinion letter is but a written version
> of his advice that, structured this way, the offering was not a
> security."

*Id.* at 605 (quoting district court's opinion; emphasis added).

In *Continental Casualty Co. v. Wendt*, 205 F.3d 1258 (11th Cir. 2000), the Eleventh Circuit upheld a district court decision applying similar reasoning. *See id.* at 1259 (in per curiam decision, "affirm[ing] the district court's judgment based on its well-reasoned order"); *id.* at 1264 (district court order, noting that lawyer's "course of conduct encouraged investment in [a company's] notes[;] though clearly this course of conduct involved different types of acts [*e.g.*, appearing at seminars and representing the notes were legal, vouching for the legality of the notes to clients, drafting brochures for use by promoters, etc.], *these acts were tied together because all were aimed at a single particular goals*" – even if the "acts resulted in a number of different harms to different persons") (emphasis added).

And finally, in *Liberty Insurance Underwriters, Inc. v. Davies Lemmis Raphaely Law Corp.*, 162 F. Supp. 3d 1068 (C.D. Cal. 2016), Judge Gee similarly took note of both state and federal decisions finding that multiple claims are "sufficiently related where the underlying actions are in service of a single plan" or "goal" or where there is a "single course of conduct." *Id.* at 1076, 1078 (internal quotation marks omitted).

Taking into account the above case law, the Court agrees with Liberty that the claim made against Hamrick based on the Collection/Au Action and the claim against Hamrick based on the Windows Action should be deemed a single claim under the Liberty insurance policy because the policy provides that claims are treated as a single claim where they arise out of or attributable to "related acts." Policy at 9. Here, the conduct of Hamrick in representing the Samuels in the Collection/Au Action and the Windows Action are logically related. Hamrick was retained to obtain compensation for damages the Samuels suffered as a result of defective construction on the Noriega Project. Tellingly, in filing their single malpractice action against Hamrick, the Samuels implicated Hamrick's conduct with respect to *both* cases, a fact which proves their relatedness. The reason why the Samuels engaged Hamrick to represent them in each lawsuit was the same: so that the Samuels could be compensated for the problems they encountered with the Noriega

United States District Court
Northern District of California

1  project.  Hamrick's retention and representation was part of a single course of conduct or a single

2  plan on the part of the Samuels.  *See* Mot. at 15 (arguing that, like the Collection/Au Action, the

3  Everest and Window Actions were part of an ongoing effort to collect damages from the Noriega

4  Project").

5          Indeed, as the California Supreme Court noted in *Bay Cities*, "[a]t some point, a

6  relationship between two claims, though perhaps "logical," might be so attenuated or unusual that

7  *an objectively reasonable insured could not have expected they would be treated as a single claim*

8  *under the policy*."  *Bay Cities*, 5 Cal. 4th at 873 (emphasis added).  Here, there is evidence that an

9  objectively reasonable insured would have expected that the Samuels' claims for malpractice in

10  the two lawsuits would be treated as a single claim under the policy – *i.e.*, the Samuels themselves

11  linked their two claims by making both claims part of the same Malpractice Action and, further,

12  by tying the claims together in the operative complaint filed in the Malpractice Action:

13          The HAMRICK FIRM further undertook representation of the
        PLAINTIFFS in their lawsuit against IWC, the manufacturer of the
14          windows installed by PW 1 at the [Noriega Project] buildings.
        Defendant GREENE assured PLAINTIFFS that the window case
15          would be handled on a contingency fee basis, *in order to rectify the*
        *previous errors that led to PLAINTIFFS' failures in the previous*
16          *cases*.

17  Ex. A (SAC ¶ 28) (emphasis added).  Admittedly, the Samuels were not the insured – that was

18  Hamrick.  Nevertheless, the fact that the Samuels linked their claims still has bearing on what

19  Hamrick or an objectively reasonable insured would have expected.  *Cf. Liberty*, 162 F. Supp. at

20  1079 (indicating that "it should [not] come as a shock to Defendants that [the claims] are related"

21  given that "Defendants' own court filings indicate that they themselves consider the claims in

22  these cases to be 'virtually identical' . . . and to 'contain identical claims involving similar

23  properties'").

24          Finally, the Court finds the malpractice based on the Collection/Au Action and on the

25  Windows Action to be "related acts" because, if an attorney were to sue, on behalf of his client, a

26  general contractor, subcontractors, and suppliers on a construction project claiming construction

27  defects and then committed numerous legal errors against some but not all defendants, resulting in

28  less than complete recovery, it is clear that an ensuing malpractice action by the client against the

attorney would be considered a single claim under the logic of *Bay Cities*.  The fact that the Collection/Au Action and Windows Action were brought sequentially should not change the result, especially where there is a causal relationship between the actions.  As Liberty points out, ¶ 28 from the SAC indicates that not only are the Samuels' malpractice claims based on the two lawsuits logically related but also that the claims are in fact causally related.  Paragraph 42 from the SAC in the Malpractice Action underscores the same.  There, the Samuels explicitly alleged:

> Ostensibly in a further attempt to provide PLAINTIFFS some recovery after all other legal avenues had failed, and to remediate the consequences of their mishandling of the other case(s), the HAMRICK firm offered to handle PLAINTIFFS' claim against IWC, the company which supplied the windows installed by PW at the . . . properties, on a contingency fee basis.

Ex. A (SAC ¶ 42).

Accordingly, the Court holds that the claims made against Hamrick for malpractice in the Collection/Au Action and the Windows Action arise out of or attributable to the same or related acts and thus should be treated as a single claim.  The limitation of liability for that single claim is $2 million and expenses incurred in defending the malpractice action are chargeable to that single claim.

D.      Remaining Issues

The Samuels argue that, even if the Court rules in Liberty's favor on the contract interpretation issue, that is not the end of the matter.  The Samuels contend that, standing in Hamrick's shoes, they are entitled to argue that Liberty breached the implied covenant of good faith and fair dealing owed to Hamrick – specifically, when Liberty failed to settle the Malpractice Action even though there was a great risk of recovery beyond the policy limits.  *See* Opp'n at 6.  The Samuels further argue that, standing in Hamrick's shoes, they are entitled to challenge how Liberty spent $2 million in defending the Malpractice Action (*e.g.*, were fees and costs reasonable?).  *See Liberty*, 162 F. Supp. 3d at 1080 (stating that "Defendants have at least raised a triable issue as to whether all fees and costs incurred by Lewis Brisbois were 'reasonable and necessary,' in that there is a genuine dispute as to whether all such fees and costs were incurred for the benefit of Defendants").

1      The Samuels' first argument is, in effect, irrelevant.  Assuming that Liberty did act in bad

2 faith, that has nothing to do with limits on liability under the insurance policy, which is the subject

3 matter of the instant case.  Moreover, the Samuels cannot bring a counterclaim for bad faith yet

4 because the appeal of the Malpractice Action is still pending.  *See, e.g.*, *McKee v. Nat'l Union Fire*

5 *Ins. Co.*, 15 Cal. App. 4th 282, 285 (1993) (stating that an action against an insurer is permitted

6 only when the underlying judgment against the insured is final; final means an appeal from the

7 underlying judgment against the insured has been concluded); *see also id.* at 289 (stating that "no

8 enforceable claim accrues against an insurer unless and until the insured's liability is, in fact,

9 established").[6]

10      As for the Samuels' second argument, the issue has never been raised in this lawsuit,

11 including in any counterclaim.  In addition, the issue is premature because the issue of whether

12 expenses incurred in defending the action is reasonable and chargeable against the $2 million

13 policy limit may be affected by the outcome of the Malpractice Action.  The Samuels conceded

14 such at the hearing.

15      The Court therefore concludes that there are no remaining issues for it to resolve.

16 **III.**    <u>**CONCLUSION**</u>

17      For the foregoing reasons, the Court grants Liberty's motion for summary judgment.

18 Because the Court has adjudicated the issue of the limit of liability, there is nothing further for the

19 Court to adjudicate.  Liberty's claims have been resolved, and there is no counterclaim by the

20 Samuels.  *See* Docket No. 41 (stipulation and order) (noting that the Court should decide the issue

21 of the "applicable Limits of Liability"; also noting the parties' agreement that, "[u]pon exhaustion

22 of the applicable Limit of Liability in the LSIC Policy(which amount will be determined by the

23 Court), LSIC has no further obligation to defend or pay Claim Expenses, and has no obligation to

24 pay Damages including any judgment or settlement of the Malpractice Action").  Accordingly, the

25 _____

26 [6] The Court notes that, in prior motion practice, the Samuels argued that their request for a
declaration that Liberty's suit here does not preclude them from obtaining damages in bad faith,

27 and Liberty basically agreed.  *See* Docket No. 41 (stipulation and order) (reflecting parties'
stipulation that Liberty's suit "does not limit the Samuels Parties' right to pursue their assigned

28 claim for alleged breach of a duty to settle, should any such claim become ripe and be pursued by
the Samuels Parties").

1  Court directs the Clerk of the Court to enter a final judgment in favor of Liberty in accordance

2  with this opinion.

3        The Court notes, however, that its ruling here does not preclude the Samuels from, *e.g.*,

4  bringing a bad faith claim against Liberty (standing in Hamrick's shoes) or from asserting a claim

5  challenging the reasonableness of the fees incurred by Liberty in defending the malpractice action

6  in the future.

7        This order disposes of Docket No. 49.

8

9        **IT IS SO ORDERED**.

10

11  Dated: October 4, 2021

12

13  _____

14  EDWARD M. CHEN
    United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28